## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| MATTHEW MASIELLO, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JAMES SWARTWOUT, JOSEPH HARTNETT, DAVID MOLFENTER, JAMES FAST, CHARLES KUMMETH, FRANK WILSON, ALAN L. BAZAAR, and JOHN A. JANITZ, )<br>)<br>)<br>)<br>)<br>)<br>Defendants. )<br>) | Case No.<br><br>**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Matthew Masiello ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of himself and the other common stockholders of Sparton Corporation ("Sparton" or the "Company") against: (i) the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants") for breaching their fiduciary duties in connection with the Merger (the "Merger") between Sparton and Ultra Electronics Holdings plc ("Ultra").

2.      Sparton is a provider of design, development, and manufacturing services for electromechanical devices, as well as engineered products complementary to the same electromechanical value stream. The Company operates through two segments: Manufacturing & Design Services ("MDS") and Engineered Components & Products ("ECP"). The core of its business, based out of the ECP segment, is a joint venture with Ultra called ERAPSCO. ERAPSCO

develops and produces U.S. derivative sonobuoy designs for the U.S. Navy as well as for foreign governments that meet Department of State licensing requirements. ERAPSCO is the largest producer of sonobuoys in the world, with combined deliveries of over 10 million sonobuoys worldwide.

3.      Sparton originally formed the ERAPSCO joint venture in 1998 with a company called Magnavox. Later that year their sonobuoy operation was spun off to form UnderSea Systems Inc. ("USSI"), which Ultra subsequently acquired. Under the joint venture agreement (the "ERAPSCO agreement"), Sparton DeLeon Springs, LLC ("SDS"), a subsidiary of Sparton, and USSI are equal partners in the ERAPSCO joint venture.

4.      On July 7, 2017, the Board culminated a severely flawed sales process and caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which Ultra will acquire Sparton and Sparton shareholders will receive only $23.50 in cash for each share of Sparton common stock they own (the "Merger Consideration"). The Merger Consideration is inadequate in light of Sparton's underlying value and financial outlook.

5.      On October 5, 2017, the Merger was approved by Sparton shareholders. The Merger was the result of a flawed process, throughout which the Board gave Ultra preferential treatment and neglected other superior bidders. The Board reached out to Ultra before they announced publicly that they were looking to sell the Company. They provided Ultra with information about the other bidders that no other bidder received, and allowed Ultra to dictate terms with other bidders. Finally, they ignored a potentially superior offer in favor of multiple extensions of exclusivity with Ultra. This preferential treatment represents a dereliction of the Board's fiduciary duties and caused a substantial loss in value for Sparton shareholders.

6.      In addition, the Individual Defendants further exacerbated their breaches of

fiduciary duty by agreeing to certain deal protection devices in the Merger Agreement that prevented other bidders from making successful competing offers.

7. For these reasons, and as set forth in detail herein, Plaintiff seeks to recover damages resulting from the Individual Defendants' violations of their fiduciary duties.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because matter in controversy, exclusive of interest and costs, exceeds the sum or value of 5,000,000.00 and is a class action where Plaintiff is a citizen of a state different from Defendants. Moreover, in the Amended and Restated Code of Regulations of Sparton Corporation, Defendants specifically name the federal courts of Ohio as a preferred forum for any fiduciary matter:

> Forum for Adjudication of Disputes. Unless the Company consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's shareholders, (iii) any action asserting a claim against the Company or any of its directors, officers or other employees alleging a violation of Corporate Matters, or (iv) any action asserting a claim against the Company governed by the internal affairs doctrine shall be a state or federal court located within the State of Ohio in all cases subject to the court having personal jurisdiction over the indispensable parties named as defendants. Any person or entity purchasing or otherwise acquiring any interest in shares of the Company shall be deemed to have notice of and consented to the provisions of this Article VII. "Corporate Matters" means the Corporation Law of the Ohio Revised Code, the Company's Second Amended Articles of Incorporation, as amended, these Regulations, and the bylaws.

9. Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice. The Individual

Defendants have also agreed to submit to the jurisdiction of this Court pursuant to the aforementioned Amended and Restated Code of Regulations of Sparton Corporation, which designated this Court as the sole and exclusive federal forum for adjudication of actions of this nature.

10.     Venue is proper in this District under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Sparton is an Ohio corporation; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (v) the Defendants explicitly designated the federal courts of Ohio as an appropriate venue in their forum selection bylaw.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a Sparton shareholder. Plaintiff is a resident of New York.

12.     Individual Defendant James Swartwout is a director of Sparton and is the Chairman of the Board.

13.     Individual Defendant Joseph Hartnett is a director of Sparton and is the President and Chief Executive Officer of the Company.

14.     Individual Defendant David Molfenter is, and has been at all relevant times, a director of the Company.

15.     Individual Defendant James Fast is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Charles Kummeth is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Frank Wilson is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Alan L. Bazaar is a director of the Company appointed as part of the Settlement Agreement with the Engine Group (defined below).

19.     Individual Defendant John A. Janitz is a director of the Company appointed as part of the Settlement Agreement with the Engine Group.

20.     Interested Party Sparton is an Ohio corporation and maintains its headquarters at 425 North Martingale Road, Suite 1000, Schaumburg, Illinois 60173. The Company's common stock trades on the NYSE under the ticker symbol "SPA".

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

21.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public stockholders of Sparton and owe them a duty of care, loyalty, good faith, candor, and independence.

22.     By virtue of their positions as directors and/or officers of Sparton, the Individual Defendants, at all relevant times, had the power to control and influence Sparton, did control and influence Sparton, and caused Sparton to engage in the practices complained of herein. Each of the Individual Defendants are required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.

23.     In a situation where the directors and officers of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all

steps necessary to maximize the value shareholders will receive or obtain a sizeable premium.  To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:  (a) adversely affects the value provided to the Company's stockholders; (b) favors themselves or discourages or inhibits alternative offers to purchase control of the corporation or its assets; (c) adversely affects their duty to search and secure the best value reasonably available under the circumstances for the Company's stockholders; (d) will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public stockholders; and/or (e) contractually prohibits the Individual Defendants from complying with or carrying out their fiduciary duties.

24.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:  (a) participating in any transaction where the Individual Defendants' loyalties are divided; (b) participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or (c) unjustly enriching themselves at the expense or to the detriment of the public stockholders.

25.     The Individual Defendants' fiduciary obligation to maximize shareholder value also required them to reject inadequate offers to purchase the Company and to maintain the Company's operations as a standalone entity if the alternative was a sale at an inadequate price. Defendants were obligated to seek the path offering the best value reasonably available to the shareholders, which could be remaining independent and not engaging in any transaction at all.

26.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Merger, violated duties owed to Plaintiff and the other public shareholders of Sparton insofar as they, *inter alia*: failed to obtain the best price possible or a reasonable premium

under the circumstances before entering into the Merger; abandoned other viable strategic alternatives and business plans to maximize shareholder value; and agreed to unreasonable deal protection devices that all but ensure that Sparton's shareholders will not receive a superior offer.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Sparton (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

28.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of August 4, 2017, there were approximately 10,050,661 shares of Sparton common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Sparton will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether the Individual Defendants have breached their fiduciary duties owed to Sparton's public shareholders in connection with the Merger; and

ii)     whether the Individual Defendants have breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Merger;

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests;

f.     Defendants have acted or refused to act on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

## I.     Relevant Corporate Background

29.     Incorporated on December 29, 1919, Sparton is a provider of design, development, and manufacturing services for electromechanical devices, as well as engineered products complementary to the same electromechanical value stream. Through its two business segments, the Company serves the medical, biotechnology, military, aerospace, industrial, and commercial markets. The Company's products and services include offerings for original equipment

manufacturers and emerging technology customers, which utilize microprocessor-based systems, such as transducers, printed circuit boards and assemblies, sensors and electromechanical components, as well as development and design engineering services relating to these product sales. The Company develops and manufactures sonobuoys and anti-submarine warfare devices used by the United States Navy, as well as by foreign governments that meet Department of State licensing requirements. The Company also manufactures rugged flat panel display systems for military panel personal computer workstations, air traffic control and industrial applications, as well as industrial grade computer systems and peripherals.

30.     Organized under the laws of England and Wales, Ultra is a defense, security, transport, and energy company. Ultra applies electronic and software technologies in military applications, safety-critical devices in aircraft, nuclear controls and sensor measurement, among other environments.

## II.     The Flawed Process that Resulted in the Merger Agreement

31.     The Merger is the result of a fundamentally flawed sales process, during which the Board unfairly favored Ultra, failed to adequately pursue higher offers, neglected other bidders, and declined to pursue other viable strategic alternatives to maximize shareholder value.

32.     The flawed sales process began in September 2015, when Sparton's former President and CEO, Cary B. Wood, approached the Board with an offer to take the Company private. As a result of the offer, the Board formed a special committee (which was later dissolved), hired Mayer Brown LLP ("Mayer Brown") to serve as legal counsel, and began the process of hiring a financial advisor.  Then, although Mr. Wood thereafter delivered a preliminary, non-binding proposal contemplating an acquisition of the Company, the special committee sent Mr. Wood a letter in which it acknowledged receipt of his proposal, stated that the Company would

not be moving forward to entertain Mr. Wood's proposal at that time, and represented that, in the event that the special committee were to authorize an exploration of an acquisition of the Company, the special committee would notify Mr. Wood. Ultimately, Mr. Wood never submitted another proposal to acquire the Company.

33. Nonetheless, the special committee proceeded as if it were going to explore an acquisition of the Company. For example, on November 4, 2015, the special committee held a meeting at which Mayer Brown discussed its observations regarding the joint venture agreement (the "ERAPSCO agreement") between Sparton DeLeon Springs, LLC, a subsidiary of the Company (previously defined as "SDS") and UnderSea Sensor Systems, Inc., a subsidiary of Ultra (previously defined as "USSI"), pursuant to which Sparton (through SDS) and Ultra (through USSI) are 50/50 partners in a joint venture (the "ERAPSCO JV"). More specifically, Mayer Brown provided its views on, among other things, the provisions of the ERAPSCO agreement that restrict each party from certain transfers of their respective interests in the ERAPSCO JV, unless the party seeking to make such a transfer first offers the other party the opportunity to purchase such interest (the "ERAPSCO transfer provisions").  What is more, despite telling Mr. Wood that it was not pursing a transaction, the special committee also retained Wells Fargo in December 2015.[1] Thereafter, Wells Fargo attended a management presentation regarding the Company's business and strategy, reviewed the Company's plan and strategy with the special committee, and reviewed and discussed a preliminary list of companies that might potentially be interested in acquiring one or more of the Company's operations.

---

[1]    The special committee retained Wells Fargo over three other potential financial advisors despite the fact that Mayer Brown had represented, and continued to represent, Wells Fargo and its affiliates with respect to matters other than its representation of the special committee.

34.     Beginning in January 2016 and throughout February and March 2016, the Company began receiving communications from a number of potential partners (including Party A and Ultra) regarding a potential transaction, including a potential acquisition of the Company and/or its business segments. In response to most of these communications, the Company indicated that the Board continued to focus on the best path forward for creating value for the Company's shareholders and that if there is an appropriate time for such a conversation, the Board would keep these parties in mind. Notably, though, in response to Ultra's outreach, the Company responded by assuring Mr. Sharma, Ultra's CEO, that, "if the Company were to consider such a transaction, the Company would contact Mr. Sharma first."

35.     In the interim, the special committee directed management to produce a five-year forecast for use by Wells Fargo, and Wells Fargo continued to discuss the Company's business plan and strategy with the special committee.  On February 5, 2016, Mr. Wood resigned as President and CEO and as a member of the Company's Board; Mr. Hartnett was appointed interim President and CEO, resigned as Chairman of the Board, but remained on the Board as a director and as a member of the special committee; and Mr. Swartwout was appointed as the Chairman of the Board.

36.     On March 8, 2016, the special committee recommended that the Board conduct a process to seek out interest in an acquisition of the Company as a whole or its parts. The special committee also recommended the formation of a new committee – the "process committee," comprised of Messrs. Hartnett, Molfenter, and Swartwout – to conduct this process. The Board adopted these recommendations.

37.     Two days later, on March 10, 2016, Engine Capital and Norwood Investments (the "Engine Group") publicly filed a Schedule 13D with the SEC disclosing, in the aggregate,

ownership of approximately 6.9% of the outstanding shares of Company common stock and stating that they intended to undertake a plan of action at the Company aimed at enhancing shareholder value, which plan may include, but not be limited to, proposals relating to the Company's operations, cost and capital allocation, strategic alternatives, the calling of special meetings, **and/or reconstitution of the Company Board**.

38.     Shortly thereafter, on March 16, 2016, the Company issued a press release announcing that it was indeed exploring strategic alternatives. **Importantly, earlier that day, before it issued the press release, the Board reached out exclusively to Ultra CEO Rakesh Sharma to give Ultra an early opportunity to make an acquisition proposal and to begin negotiations for a non-disclosure agreement under which the Company would provide certain non-public information to Ultra to facilitate Ultra making an acquisition proposal.**

39.     On the very next day, March 17, 2016, **at the request of the Board**, representatives of Wells Fargo called representatives of Ultra to discuss exploring strategic alternatives with Ultra. During the call, the representatives of Wells Fargo informed Ultra that a sale of ECP to Ultra might not be financially attractive to Sparton, given the potential tax impact that would result from such a transaction, and emphasized that the more straightforward course of action would be an acquisition of the Company in its entirety by Ultra.

40.     Again, on April 22, 2016, **at the request of the process committee**, representatives of Wells Fargo called representatives of Ultra to discuss the possibility of Ultra proposing to acquire the Company. **In other words, Sparton asked Ultra to buy it, not the other way around.** During this call, a representative of Ultra stated that Ultra was not interested in acquiring MDS, but that Ultra would be open to considering an acquisition of the entire Company.

41.     On May 4, 2016, the Company announced that it had entered into a Settlement

Agreement with the Engine Group, pursuant to which Alan L. Bazaar and John A. Janitz were appointed to the Board.  Under the agreement, the Engine Group agreed, amongst other things, to vote its Company shares in support of all of the Company's director nominees, including both Messrs. Bazaar and Janitz, at the Company's 2016 annual meeting of shareholders and to abide by customary standstill provisions until January 1, 2017. In addition, under the terms of the agreement, Mr. Janitz and Mr. Bazaar were each appointed to the process committee and the special committee in charge of the sales process.

42.     That same day, the Company filed a Form 8-K with the SEC, announcing amendments to its Change in Control payments.

43.     On May 9, 2016, Ultra became the first potential buyer with whom Sparton entered into a non-disclosure agreement. From there, the sales process would drag on for months. During those months, the Board received numerous offers providing greater value than the Merger Consideration – with a few exceeding $30 per share – but the Board appeared in no hurry to strike a deal – at least, not with anyone but Ultra.  Throughout this same period, Ultra was given preferential treatment, despite the fact that Ultra threatened to use its leverage under the ERAPSCO agreement to stop the Company from pursuing other bidders.[2]

44.     For example, following a June 14, 2016 meeting of the board of directors of the ERAPSCO JV, representatives of Ultra met with Mr. Hartnett and inquired about the Board's

---

[2]     More specifically, under the terms of the ERAPSCO agreement, there are provisions that restrict each party from certain transfers of their respective interests in the ERAPSCO joint venture unless the party seeking to make such a transfer first offers the other party the opportunity to purchase such interest (previously defined as the "ERAPSCO transfer provisions"). Sparton and Ultra heavily disagreed on the effect of the ERAPSCO transfer provisions, but that did not stop Ultra from intentionally interfering with the sales process. Also during this time, on June 29, 2016, the Board adopted resolutions formally rendering the special committee inactive, such that the Board was now carrying out the duties previously delegated to the special committee, with Wells Fargo and Mayer Brown to serve as advisors to the Board.

process of exploring strategic alternatives and were told by Mr. Hartnett that Wells Fargo would contact Ultra soon about participating in the marketing process. In response, representatives of Ultra inquired as to whether the marketing process only contemplated the Board pursuing a sale of the entire Company, to which Mr. Hartnett responded that the Board was committed to considering all potential transactions, in response to which a representative of Ultra stated that Ultra would expect Sparton to comply with the ERAPSCO transfer provisions as part of the marketing process. Mr. Hartnett responded that it was not clear at this stage of the marketing process whether the ERAPSCO transfer provisions would apply to any transaction the Board might select to pursue, but that in any event the Company would comply with all of its obligations under the ERAPSCO agreement.

45. On July 12, 2016, Wells Fargo received initial indications of interest from seven strategic buyers, including Ultra, and 14 financial buyers. Nine of the initial indications of interest contained a proposal to acquire the entire Company, with indicative prices ranging from $18.00 **to $28.00 per share**. Six of the initial indications of interest contained a proposal to acquire ECP, with indicative prices ranging from $220 million to $275 million, on a cash-free, debt-free basis. Eight of the initial indications of interest contained a proposal to acquire MDS, with prices ranging from $90 million to $150 million, on a cash-free, debt-free basis. Ultra's initial indication of interest contained a proposal to acquire the entire Company for $21.00 per share, which attributed a value of $60 million, on a cash-free, debt-free basis, to MDS and a value of $270 million, on a cash-free, debt-free basis, to ECP. Party B submitted a proposal to acquire the entire Company at a price range of **$26.00 to $28.00 per share**. Party B's indication of interest also contained a proposal to acquire ECP for $250 million, on a cash-free, debt-free basis. And Party C submitted an indication of interest to acquire the entire Company at a price range of **$25.00 to $28.00 per**

**share**.

46.     On July 20, 2016, Wells Fargo Securities received an initial indication of interest from a strategic buyer to acquire ECP for $300 million, on a cash-free, debt-free basis.

47.     On July 23, 2016, Wells Fargo Securities received an initial indication of interest from a strategic buyer to acquire ECP for $320 million, on a cash-free, debt-free basis.

48.     On July 25, 2016, Ultra was the first bidder to receive a management presentation, at the Company's corporate headquarters, from Mr. Hartnett and other members of Company management.

49.     On July 28, 2016, Wells Fargo received a revised initial indication of interest from an unidentified strategic buyer to acquire ECP following the sale of MDS for $325 million on a debt-free basis.

50.     Then, on August 22, 2016, Mr. Hartnett spoke to Mr. Sharma by telephone regarding Ultra's participation in the current stage of the marketing process and the next stages in the process.

51.     From August 19 through August 23, 2016, Wells Fargo received revised indications of interest from four strategic buyers, including Ultra, and seven financial buyers. Six of the revised indications of interest contained a proposal to acquire the entire Company, with prices ranging from $19.50 to **$28.00 per share**. Four of the revised indications of interest contained a proposal to acquire ECP, with prices ranging from $235 million on a cash-free, debt-free basis to $325 million, on a debt-free basis, which proposal was structured as an acquisition of the Company following a pre-closing divestiture of MDS. Two of the revised indications of interest contained a proposal to acquire MDS, with prices ranging from $92.5 million to $120 million, on a cash-free, debt-free basis. Ultra's revised indication of interest contained a proposal to acquire the entire

Company at a price of $26.00 per share, contingent upon a sale of MDS for $145 million.[3] Notably, **Ultra's revised indication of interest reflected a valuation of ECP that was $90 million lower than the highest revised indication of interest for that business segment and a valuation of MDS that was approximately $25 million higher than any other revised indication of interest for that business segment.** Its revised indication of interest also came hand-in-hand with a **warning that it reserved its rights under the ERAPSCO transfer provisions**. Party B submitted a proposal to acquire the entire Company at a price range of **$26.00 to $28.00 per share**. Party B's revised indication of interest also contained a proposal to acquire the Company's ECP business segment for $250 million, on a cash-free, debt-free basis. Finally, Party C submitted a proposal to acquire the entire Company at a price of **$26.00 per share**.

52.     On August 24, 2016, Wells Fargo received a revised indication of interest for the acquisition of ECP for a price ranging from $200 million to $220 million, on a cash-free, debt-free basis.

53.     Just days after receiving Ultra's latest bid, and despite the fact that Ultra's revised indication of interest valued ECP by $90 million lower than the highest revised indication of interest for tha business segment, on August 25, 2016, Mr. Hartnett nonetheless spoke to Mr. Sharma by telephone, **during which call he provided inside information to Ultra in an attempt to get it to buy Sparton**. More specifically, during this call, Mr. Hartnett (1) advised Mr. Sharma that Ultra's valuations were lower than the highest revised indications of interest **offered by other bidders** and (2) encouraged Mr. Sharma to have Ultra raise its price to top all other potential

---

[3]     To the extent the sale price for MDS would be higher or lower than $145 million, the per share purchase price would be adjusted accordingly to account for the change in the Company's implied enterprise value.

buyers. During the same call, Mr. Hartnett also inquired as to whether Ultra would commit to work as a cooperative joint venture partner with any other potential buyer if another buyer bought the Company. Mr. Sharma responded that Ultra would further consider its most recent indication of interest and would consider submitting a revised indication of interest in the coming days, but notably did not agree to work with any other bidder.

54. Very much to the contrary, on September 1, 2016, Ultra instead (1) submitted a revised indication of interest to acquire the entire Company at a price of $27.00 per share, contingent upon a sale of MDS for $125 million[4] and, (2) hand-in-hand, warned that it reserved its rights under the ERAPSCO transfer provisions.

55. In the interim, on August 30, 2016, Wells Fargo received a revised indication of interest for the acquisition of MDS for $100 million (*i.e.*, $10 million more than Ultra's valuation), on a cash-free, debt-free basis.

56. Then, on September 12, 2016, a representative of Wells Fargo spoke by telephone with a representative of RBC Capital Markets ("RBC"), Ultra's financial advisor. During this call, and "[a]s directed by the process committee," the Wells Fargo representative provided RBC with certain information provided by the Company regarding the Company's corporate cost structure and the likely liabilities that would remain in the Company if the Company were to divest MDS – **information that does not appear to have been shared with any other bidder**. Also during this call, the RBC representative informed the representatives of Wells Fargo that Ultra and the Company appeared to have different views on the applicability of the ERAPSCO transfer provisions to the marketing process and that it would be useful for Mr. Hartnett and Mr. Sharma

---

[4] To the extent the sale price for MDS would be higher or lower than $125 million, the per share purchase price would be adjusted accordingly to account for the change in the Company's implied enterprise value.

to discuss this matter.

57.     Consistent with its ongoing intent to use the ERAPSCO transfer provisions to force Sparton into a deal at an insufficient price, on September 13, 2016, Mr. Sharma sent Mr. Hartnett an email indicating that Ultra could not justify spending millions of dollars on due diligence expenses if it did not have exclusivity with the Company regarding a potential strategic transaction and that given the different views of the Company and Ultra as to the applicability of the ERAPSCO transfer provisions to the marketing process, he would like to discuss the issue with Mr. Hartnett by telephone. So, on September 14, 2016, Mr. Hartnett spoke with Mr. Sharma by telephone, during which they discussed the current state of the marketing process, **including the fact that other potential buyers were offering higher value than Ultra**, and their different views as to the applicability of the ERAPSCO transfer provisions to the marketing process. Mr. Hartnett and Mr. Sharma agreed that they would meet, together with their respective financial advisors, in Boston on September 19, 2016 to seek a resolution to the issue relating to the ERAPSCO transfer provisions.

58.     On September 19, 2016, Mr. Hartnett and Mr. Sharma met in Boston, together with representatives of their respective financial advisors. During the meeting, Mr. Hartnett told Mr. Sharma that a sale of the entire Company was the most likely strategic transaction that would result from the marketing process. Mr. Sharma indicated Ultra's strong preference that Ultra would only acquire the Company following a sale of MDS or, alternatively, that the Company sell MDS to a buyer and otherwise remain a public company. Mr. Hartnett and Mr. Sharma discussed their respective views on the applicability of the ERAPSCO transfer provisions to the marketing process. Mr. Hartnett and Mr. Sharma purportedly agreed that they should consider amending the ERAPSCO agreement to clarify the application of the ERAPSCO transfer provisions to

circumstances such as the marketing process, as well as modify other commercial points relating to issues that had arisen in the ERAPSCO JV since the last time the ERAPSCO agreement was amended. Although the Company and Ultra and their respective advisors subsequently negotiated a draft of an amendment of the ERAPSCO agreement, no such amendment or other agreement regarding the applicability of the ERAPSCO transfer provisions was ever executed by the Company, Ultra, or their respective subsidiaries.

59.     By early 2017, the Board had narrowed the potential buyers that executed non-disclosure agreements down to two potential options, Party B and Party C. Both parties offered value greater than the Merger Consideration, but neither party executed a deal. Both bidders were ultimately driven away by Ultra.

60.     More specifically, from October 7, 2016 through October 10, 2016, Wells Fargo received revised indications of interest from three potential buyers. Party C submitted a revised indication of interest to acquire the entire Company for $26.00 per share; an unidentified bidder submitted an updated indication of interest containing a proposal to acquire the entire Company for $21.00 per share; and a third unidentified bidder submitted an indication of interest to acquire ECP at a price of $260 million, on a debt-free basis.

61.     Tired of bidding against other, higher bidders, Ultra decided to "drop out" of the process and instead wait for the highest bidder to emerge, then quash that bid and purchase the Company on the cheap.  Specifically, on October 8, 2016, Mr. Sharma informed Mr. Hartnett that Ultra was purportedly no longer pursuing a strategic transaction with the Company, but that, given the ERAPSCO JV relationship, Ultra would like for the Company to provide an opportunity for representatives of Ultra to meet with representatives of any potential buyer of the Company or ECP prior to the Company entering into a definitive transaction agreement with such potential

buyer – to which Mr. Hartnett agreed.

62.     On October 14, 2016, Party B submitted an updated indication of interest containing a proposal to acquire the entire Company for $24.00 per share.

63.     On October 19, 2016, the process committee held a telephonic meeting, during which Wells Fargo disclosed that additional information regarding investment banking and lending relationships that it or its affiliates had with the remaining bidders.[5] As a result of these relationships, the process committee considered whether the Company board should retain a second financial advisor in connection with its consideration of strategic alternatives.

64.     On November 2, 2016, during a Board meeting, the Board discussed these issues and determined to identify a second financial advisor.  Also during this meeting, the Board decided to "update" the then-current 5-year management forecast and to provide this revised forecast to potential buyers for the next round of proposals. Unbelievably, the Board acknowledged that the revised 5-year forecast would reflect a **downward adjustment of financial performance** as compared to the then-current 5-year forecast. Six days later, on November 8, 2016, the Board held a telephonic meeting, during which Company management presented and discussed this revised 5-year management forecast, after which the Board approved the revised forecast – with "certain [unidentified] changes" – for distribution to bidders.

65.     On November 15 and 17, 2016, respectively, Party C submitted a proposal to acquire the entire Company for $26.25 per share and Party B submitted a proposal to acquire the

---

[5]     Specifically, and "[a]mong other things," Wells Fargo disclosed that (i) Wells Fargo or an affiliate of Wells Fargo is the lead bank for the current credit facility of a subsidiary of Party B and (ii) Wells Fargo or an affiliate of Wells Fargo is a participant in the current credit facility of a consultant that has been advising Party B in its evaluation of a strategic transaction with the Company and that might also provide equity financing to Party B in connection with any such transaction.

entire Company for $21.50 per share. Party B's proposal requested a meeting with Ultra to discuss the ERAPSCO JV and agree on maintaining the ERAPSCO JV without material change through 2023.

66.     On November 18, 2016, with the approval of the Board, the Company entered into an agreement with Raymond James for Raymond James to serve as a second financial advisor and to provide a second fairness opinion.

67.     On November 22, 2016, with Ultra waiting patiently on the sidelines, the process committee decided to pursue a potential acquisition of the Company by Party C and, to that end, seek to arrange a meeting with representatives of the Company and Ultra and Party C, respectively. Accordingly, on December 2, 2016, Mr. Hartnett, Mr. Sharma, and a representative of Party C met at the Company's corporate headquarters to discuss the ERAPSCO JV.  Mr. Sharma and the representative of Party C each made presentations to each other regarding their respective companies and their views on the future of the ERAPSCO JV and the ERAPSCO agreement in the event Party C were to acquire the Company.  After this meeting, on December 5, 2016, Mr. Sharma told Mr. Hartnett that he thought Party C would be an acceptable joint venture partner for Ultra, in the event that Party C were to acquire the Company.  This agreement would not last long though.

68.     Rather, after a December 11, 2016 call between Mr. Hartnett, Mr. Sharma, and a representative of Party C, during which Party C proposed certain changes to Ultra regarding the ERAPSCO JV, and after Mr. Hartnett spoke with the representative of Party C, who told Mr. Hartnett that arriving at an agreement with Ultra on the future conduct of the ERAPSCO JV was necessary if Party C were to proceed with its proposal to acquire the Company, on December 16, 2016, Mr. Sharma stated that he thought that Ultra and Party C were aligned on the future conduct of the ERAPSCO JV in the event Party C were to acquire the Company and that he thought an

agreement reflecting that understanding could be executed. Mr. Sharma stated that he would send a draft of an amendment to the ERAPSCO agreement to reflect the relevant changed terms to memorialize this understanding. But when this draft arrived, it was clear that Ultra had no intent of working with any one in the ERAPSCO JV.

69.     Rather, on December 20, 2016, Mr. Hartnett spoke with a representative of Party C by telephone, during which they discussed Ultra's proposed amendment to the ERAPSCO agreement and they both agreed that Ultra's **proposed amendment was unworkable** and did not provide the clarity that Party C sought regarding the future conduct of the ERAPSCO JV in the event Party C were to acquire the Company. Later that day, Mr. Hartnett sent an email to Mr. Sharma to schedule a telephone call to discuss Ultra's proposed amendment to the ERAPSCO agreement, but he and Mr. Sharma did not have that discussion.

70.     As a result of Ultra's conduct, on December 26, 2016, Party C reduced its proposal to acquire the entire Company from $26.25 to $23.50 per share in light of the "clarification it had requested regarding the future conduct of the ERAPSCO JV in the event Party C were to acquire the Company."  Party C would later communicate that Ultra's proposed amendment to the ERAPSCO agreement **appeared to indicate a lack of cooperation from Ultra with Party C** with respect to the potential future of the ERAPSCO JV.

71.     In the interim, on December 7, 2016, Party B sent Wells Fargo a letter increasing its November 17, 2016 proposal from $21.50 to $24.50 per share of Company common stock.  In light of Ultra's recalcitrance regarding Party C, however, the special committee was forced to similarly inquire whether it was likely that Ultra would react differently to Party B regarding the ERAPSCO JV, should a transaction with Party B be pursued.

72.     Ultimately, the process committee decided to ask Party B and Party C to provide

proposals assuming that there would be no changes to the ERAPSCO agreement or other agreement with Ultra prior to an acquisition of the Company and that the post-acquisition conduct of the ERAPSCO JV would be governed by the ERAPSCO agreement as currently in effect.

73.     In response, on January 4, 2017, Party B sent a letter stating that in order to re-engage in the marketing process, it was requesting permission from the Company to engage in discussions with Ultra and the U.S. Navy, the largest customer of the ERAPSCO JV.

74.     On January 5, 2017, Party B communicated to Mr. Hartnett the following day that Party B had concluded that the **ERAPSCO transfer provisions would not apply to an acquisition of the Company by Party B** and that Party B was willing to proceed with a transaction to acquire the Company without conditioning its proposal on any amendment to the ERAPSCO agreement. The representative of Party B also requested that Mr. Hartnett arrange an in-person meeting with representatives of Party B, the Company and Ultra to discuss the future conduct of the ERAPSCO JV in the event Party B were to acquire the Company.  Similarly, on January 6, 2017, Party C communicated that it had concluded that the **ERAPSCO transfer provisions would not apply to an acquisition of the Company by Party C**. The process committee decided that Mr. Hartnett should contact Mr. Sharma and arrange a meeting with Mr. Hartnett, Mr. Sharma and a representative of Party B.

75.     On January 9, 2017, Party C sent to Wells Fargo a letter stating that, in light of the results of its recent due diligence efforts, Party C was willing to move forward with a transaction to acquire the Company without conditioning its proposal on any amendment to the ERAPSCO agreement.

76.     However, during the week of January 9, 2017, a representative of RBC contacted a representative of Wells Fargo and stated that **Ultra would not be comfortable with having**

**Party B** as a joint venture partner if Party B were to acquire the Company.

77.     On January 25, 2017, the Board directed Company management to update the current financial projections to reflect results of the Company's second fiscal quarter for the 2017 fiscal year and directed Wells Fargo and Raymond James to provide the updated projections to Party B and Party C on January 30, 2017. The Board directed Wells Fargo and Raymond James to request that "best and final" proposals from Party B and Party C be submitted by February 2, 2017.

78.     But then, on January 30, 2017, Mr. Sharma again indicated that he did not think Ultra would be comfortable with Party B as a joint venture partner in the ERAPSCO joint venture. Mr. Sharma also acknowledged to Mr. Hartnett and the representatives of Party B that Ultra could not control whether Party B acquired the Company, but under the ERAPSCO agreement, Ultra had the right to terminate the agreement for convenience on 18 months' notice and Ultra might exercise that right.

79.     On January 31, 2017, Party E (who had contacted the Company to reengage in the process on January 25, 2017) submitted a proposal to acquire the Company for **$25.50 per share**. Similarly, on February 1, 2017, Party F (who had contacted the Company to reengage in the process on February 1, 2017) submitted a proposal to acquire the Company for $23.00 per share.

80.     On February 6, 2017, Party B submitted a proposal to acquire the Company for **$24.50 per share**, and Party C submitted a proposal to acquire the Company for **$24.00 per share**. Parties E and F did not submit bids.

81.     On February 16 and 20, 2017, Party C sent a letter to the Company stating that it would increase its proposed price to **$24.25 per share and then $24.50 per share, respectively,** if Party C and the Company entered into a mutually acceptable exclusive negotiation arrangement by February 20, 2017. The process committee nonetheless continued to be focused on a potential

transaction with Party B.

82.    Then, on February 23, 2017, just as Sparton was about to enter into an exclusivity agreement with Party B, Ultra sent a letter to the Company stating, among other things, its position that the ERAPSCO transfer provisions give USSI a right of last refusal for any offer to purchase the Company, reserving its rights under the ERAPSCO agreement, and requesting that the Company provide it with the terms and conditions on which the Company would propose to engage in a transaction. Ultra followed this letter up with a February 24, 2017 letter from its legal counsel, in which it stated, that, in the event the Company fails to comply with its obligations under the ERAPSCO transfer provisions, Ultra will take all legal action available to it to enforce its rights. Finally, on March 3, 2017, USSI sent a letter to the Company requesting that the Company confirm by March 10, 2017 in writing that it would honor its obligations under the ERAPSCO transfer provisions, and stating that, if the Company did not so confirm, then USSI will invoke the dispute resolution mechanism provided for in the ERAPSCO agreement.

83.    Also on March 3, 2017, Mr. Hartnett provided copies of these letters to Party B.

84.    On March 7, 2017, Ultra sent another letter to the Company stating, among other things, that its counsel would be contacting the Company's attorneys to agree on next steps to establish procedures for the dispute resolution mechanism under the ERAPSCO agreement and that Ultra would not be a party to a joint venture agreement with Party B in any form or manner other than honoring Ultra's obligations following termination. The letter went on to state that if the acquirer were Party B, Ultra would serve notice of its decision to terminate the ERAPSCO agreement. Later that day, Mr. Hartnett forwarded the letter to Party B.

85.    This effectively ended any potential deal between Sparton and Party B.  Indeed, on March 13, 2017, Party B communicated that it was reconsidering whether it would remain in the

marketing process in light of Ultra's recent letters; by April 14, 2017, Party B indicated that it would likely not pursue an acquisition of the Company, given the response from Ultra to the possibility of an acquisition of the Company by Party B, including Ultra's threat to terminate the ERAPSCO agreement in the event of such an acquisition; and, on April 26, 2017, the Board learned that, even if Party B would consider submitting another offer, it would be at less than $24.50 per share based on the assumption that the ERAPSCO JV would be terminated by Ultra if Party B were to acquire Sparton.

86.     On March 9, 2017, Party C sent a letter to the Company stating that its best offer was **$24.50 per share**.  On the same day, and in light of Ultra's position regarding Party B, including its threat to terminate the ERAPSCO agreement in the event that Party B were to be the acquirer of the Company, the Board decided to pursue an acquisition of the Company by Party C, instead of Party B, and grant Party C the 15 business day exclusivity period it requested.

87.     On March 11, 2017, Mr. Hartnett spoke with Mr. Sharma to inquire as to whether Ultra would find Party C an acceptable partner in the ERAPSCO joint venture. Just as it had originally approved of Party B, Mr. Sharma indicated that, as opposed to Party B, Party C would be an acceptable joint venture partner for Ultra. Therefore, on March 15, 2017, Sparton and Party C entered into an exclusivity agreement.

88.     However, by April 5, 2017, after discussions with Ultra, **Party C stated that it believed Ultra was of the view that Party C would not be an acceptable joint venture partner, and that Ultra would not be a cooperative partner with Party C in the ERAPSCO joint venture in the event of Party C's acquisition of the Company**.

89.     This effectively ended any potential deal between Sparton and Party C. Indeed, on April 14, 2017, Party C and its partner reiterated that the Company's relationship with Ultra in the

ERAPSCO JV caused them concerns because their discussions with representatives of Ultra did not demonstrate a clear willingness by Ultra to be a cooperative partner with the Company in the ERAPSCO JV following an acquisition of the Company by Party C and its partner, and, on April 26, 2017, the Board learned that Party C and its partner no longer intended to be a part of the process and that, if they were to re-engage at a later time, it would be at less than $24.50 per share based on the assumption that the ERAPSCO JV would be terminated by Ultra if Party C were to acquire Sparton.

90.     With all other potential acquirers run off by Ultra, during an April 7, 2017 Board meeting, the Board discussed the following options: (i) continuing with Party C without granting an extension of exclusivity; (ii) re-engaging with Party B; (iii) seeking to re-engage with other potential acquirers of the Company from earlier in the sales process; (iv) exploring whether to pursue a sale of MDS with a later potential sale of the Company, which would have continued as the owner of ECP; (v) approaching Ultra regarding a potential acquisition of the Company; or (vi) concluding the sales process without a strategic transaction.

91.     Instead of waiting for the market to stabilize after Ultra's interference, attempting to amend or renegotiate the ERAPSCO transfer provisions and proceed with the sales process, or continuing the course of business as a valuable standalone entity, the Board hastily re-entered into negotiations with Ultra for the sale of the Company. It appears that by this point, the Board had completely abandoned "continu[ing] to focus on the best path forward for creating value for the Company's shareholders."

92.     Indeed, on April 10, 2017, Mr. Hartnett spoke with Mr. Sharma regarding his discussion with representatives of Party C, during which call Mr. Sharma indicated that if Party C and its partners were to withdraw from the sales process, **Ultra would be interested in acquiring**

the Company.

93.     On the very next day, April 11, 2017, "at the request of the Company board," a representative of Wells Fargo spoke with Mr. Sharma regarding a potential acquisition of the Company by Ultra. And, by April 14, 2017, the Board completely abandoned Party B and C and decided to explore a potential acquisition of the Company by Ultra. It did so, despite being informed by Ultra as soon as April 21, 2017 that its offer price would be **less than $24.50 per share.** Indeed, on the very same day, April 21, 2017, Ultra sent an indication of interest to Wells Fargo to acquire the Company for **only $23.50 per share**.

94.     Seven days later, Ultra sent an updated indication of interest to Wells Fargo that maintained the same terms as the April 21, 2017 indication of interest and **ascribed a minimum value for MDS materially below other indications received by the Company from bidders for MDS**. Despite this, the Board authorized Mr. Hartnett to negotiate an exclusivity agreement with Ultra and, on May 10, 2017, Sparton and Ultra executed an exclusivity agreement based upon a price lower than both Party B and Party C had offered.

95.     As part of the potential merger with Ultra, the Company was to continue trying to sell its MDS business segment. Although Ultra ascribed a minimum value for MDS materially below other indications received by the Company from bidders for MDS, by May 26, 2017, the Company had received offers for the MDS segment **as high as $80 million**. Nonetheless, **Ultra refused to increase its offer**, stating that the MDS sale was not a condition to the transaction. **In other words, Ultra was essentially paying $23.50 for the ECP business segment, and was getting the MDS segment for free.**

96.     On May 31, 2017, Party G made an undisclosed proposal to acquire the Company. Sparton immediately notified Ultra of the receipt of the communication, but made no effort to

pursue the superior proposal. On June 6, 2017, Party G again made an offer to acquire the Company for $22.00 to $24.00 per share – a price potentially higher than the Merger Consideration. They were again rebuffed.

97.     By June 12, 2017, the Board was willing to complete the sale at any cost, stating their desire to "seek to sign a merger agreement with Ultra as soon as possible."

98.     When the exclusivity period with Ultra ended on June 21, 2017, the Company made no attempt to pursue the superior offer made by Party G. Instead, it extended the exclusivity agreement with Ultra. Again, when the exclusivity period ended on June 26, 2017, the Company made no attempt to pursue the superior offer made by Party G, but instead extended the exclusivity period again to July 6, 2017.

99.     On June 23, 2017, press reports indicated that Sparton and Ultra were in "deep sale negotiations," which Ultra and Sparton publicly confirmed on June 24 and 26, 2017, respectively. Also on June 26, 2017, Ultra sent its "final offer" to acquire Sparton – for **just $22.35 per share**. Ultra justified this substantial decrease in its offer by alleging that it believed that Sparton's outstanding debt was $12 million higher than the amount it had been assuming for purposes of determining the enterprise value of the Company.  Although the Company had recently received five revised indications of interest from potential buyers of MDS (with indications ranging from $45 million to $80 million for the sale of MDS on a cash-free, debt-free basis), the process committee nonetheless instructed Wells Fargo and Raymond James to extend the exclusivity agreement with Ultra to July 6, 2017 and to seek an increase in consideration to $23.50.

100.     On June 30, 2017, Sparton received a final "package deal" reflecting a revised final offer from Ultra to acquire the Company for $23.50 per share, but which was contingent on the Company accepting Ultra's position on four major open points in the Merger Agreement. The

Board acceded to all of these demands and, on July 5, 2017, approved the Merger Agreement.

101.    In sum, the Board wholly failed to maximize shareholder value.  It oversaw a fundamentally flawed sales process, during which higher offers and better strategic alternatives to maximize shareholder value were not pursued, and other interested bidders were neglected in favor of finalizing a deal for inadequate Merger Consideration with Ultra. The Individual Defendants' intentional actions inflicted significant harm upon Sparton shareholders by depriving them of fair consideration for their shares and the ability to partake in the Company's strong growth prospects.

### III.    The Merger Consideration Inadequately Compensates Shareholders in Light of Sparton's Underlying Value and Financial Outlook

102.    The Merger Consideration is inadequate in light of Sparton's underlying value and financial outlook.  Indeed, the Merger Consideration represents an 11% *discount* to Sparton's 52-week high trading price of $26.43, and a mere 5% premium to its 52-week average closing price of $22.30.

103.    Although Sparton missed on its overall third quarter earnings projections, there was no indication of long-term devaluation. In fact, it had strong growth in key areas, including its ECP segment. ECP reported a gross profit margin of 27.6% and operating income of $5.3 million, a 71% increase from the previous quarter. On May 09, 2017, President and CEO Joseph J. Hartnett announced:

> Our Medical facilities are continuing to perform well while certain Mil/Aero and industrial facilities experienced unexpected delays in a couple of customer programs. As expected, our ECP Segment performance improved significantly over the prior quarter. Overall, while we are not satisfied with the quarter's results, we are making progress in building a stronger more productive infrastructure while continuing to explore a potential acquisition of the Company.

Senior Vice President and Chief Financial Officer Joe McCormack added:

> We are pleased that we were able to hold the line on our long-term

debt during the quarter in light of investments in infrastructure and working capital needs in the quarter. The management of debt levels, generation of free cash flow and optimization of earnings continues to be a priority of the Company.

104.    A few days after the earnings announcement, on May 15, 2017, Sparton announced the award of a $41.5 million military contract to manufacture sonobuoys for the United States Navy. Similarly, on July 25, 2017, Sparton announced the award of a $14.6 million foreign sales contract to manufacture passive and active sonobuoys. The manufacture of sonobuoys is the "crown jewel" of Sparton's ECP business segment,[6] and these recent contracts demonstrate the underlying value and strong financial outlook of Sparton.

105.    Once rumors of the Merger spread, but before the Merger Agreement was executed and the Merger Consideration announced, analysts estimated the deal price at $30 per share, a significant premium to both the Company's stock price and the Merger Consideration. Further, Raymond James – **Sparton's own financial advisor** – valued the Company at a significantly higher price than the Merger Consideration, calculating an implied equity value per share of up to $45.86, nearly double the Merger Consideration. Even worse, and as outlined above, through a severely flawed sales process, the Board failed to execute on higher valued offers, including those in line with the experts' valuations, north of $30 per share.

106.    In sum, the Board's decisions throughout the flawed sales process significantly and directly harmed Sparton shareholders. The Board failed in their duty to take all steps necessary to maximize the value shareholders receive and obtain a reasonable premium. The $23.50 Merger Consideration inadequately compensates shareholders in light of Sparton's underlying value and financial outlook.

---

[6]     *See* https://seekingalpha.com/article/4085767-sparton-low-risk-merger-arbitrage-opportunity-36-percent-upside.

## IV. The Board Agreed to Deal Protection Provisions That Ensured a Superior Offer Would Not Emerge

107.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants breached their fiduciary duties by agreeing to certain deal protection provisions in the Merger Agreement that operated conjunctively to deter other suitors from submitting a superior offer for Sparton.

108.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Sparton shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) initiate, solicit or knowingly take any action to facilitate, encourage or solicit any acquisition proposal (as defined below) or the making of any proposal that would reasonably be expected to lead to an acquisition proposal; (ii) participate in any discussions or negotiations regarding, or furnish or provide any non-public information to any person in connection with, any acquisition proposal or afford access to the business, properties, assets, books or records of the Company or any of its subsidiaries to, or knowingly assist, participate in, facilitate or encourage any effort relating to an acquisition proposal by, any person that is seeking to make, or has made, an acquisition proposal; (iii) except as required by applicable law, amend or grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of the Company or any of its subsidiaries; or (iv) enter into any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement or other similar agreement relating to an acquisition proposal.

109.     Additionally, the Merger Agreement grants Ultra recurring and unlimited matching rights, which provides Ultra with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four business days to negotiate with Sparton, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

110.    The non-solicitation and matching rights provisions essentially ensured that a superior bidder would not emerge, as any potential suitor would undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Ultra could easily foreclose a competing bid.  As a result, these provisions unreasonably favored Ultra, to the detriment of Sparton's public shareholders.

111.    Lastly, the Merger Agreement provides that Sparton must pay Ultra a termination fee of $7,500,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensured that no competing offer would emerge, as any competing bidder would have to pay a naked premium for the right to provide Sparton shareholders with a superior offer.

112.    Ultimately, these preclusive deal protection provisions restrained the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

113.    Accordingly, Plaintiff is entitled to recover damages.

## COUNT I

**On Behalf of Plaintiff and the Class Against the
Individual Defendants for Breaches of Fiduciary Duties**

114.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

115.    The Individual Defendants have violated fiduciary duties owed to the public stockholders of Sparton.

116.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to obtain for the public stockholders of Sparton the highest value available for Sparton in the marketplace.

117.    As alleged herein, the Individual Defendants have initiated a process to sell Sparton that undervalues the Company and vests them with benefits that are not shared equally by Sparton's public stockholders. In addition, by agreeing to the Merger, the Individual Defendants have capped the price of Sparton stock at a price that does not adequately reflect the Company's true value. Moreover, Defendants failed to sufficiently inform themselves of Sparton's value, or disregarded the true value of the Company, in an effort to benefit themselves.  Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and Board that is committed to the Merger.

118.    The Defendants dominate and control the business and corporate affairs of Sparton, and are in possession of private corporate information concerning Sparton's assets, business, and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Sparton which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

119.    As a result of the actions of Defendants, Plaintiffs and the Class will suffer injury in that they have not and will not receive the highest available value for their equity interest in Sparton.  Plaintiffs and the members of the Class seek damages for the Defendants' breaches of fiduciary duty in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Directing Defendants to account to and compensate Plaintiff and the Class for damages sustained because of the wrongs complained of herein and the Merger;

C.      Awarding Plaintiff the costs of this action, including reasonable allowance for

Plaintiff's attorneys' and experts' fees; and

D.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

KARON LLC

  /s/  Daniel R. Karon
Daniel R. Karon (#0069394)
Beau D. Hollowell (#0080704)
700 West St. Clair Avenue, Suite 200
Cleveland, Ohio 44113
Phone: 216.622.1851
Fax: 216.241.8175
dkaron@karonllc.com
bhollowell@karonllc.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
Michael.Palestina@ksfcounsel.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com